# Sullivan *v.* Jones & Laughlin Steel Company, Appellant.

*Equity—Equity practice—Violation of decree—Contempt—Evidence.*

When those enjoined by a decree in equity are charged with having violated it, its violation must be made to clearly and satisfactorily appear by the petitioner asking for its enforcement. Until its violation so appears there can be no finding of contempt, and a fine will not be imposed, nor an order of commitment made.

The procedure by rule for contempt should not be exercised unless a case is presented of actual disobedience. The entry of an order of injunction is, in some respects, analogous to the publication of a penal statute. It is a notice to the party that certain things must be done or not done, under a penalty to be fixed by the court. The language of such notice should not be stretched to cover acts not fairly and reasonably within its meaning.

*Equity—Injunction—Decree—Nuisance—Dust from steel works—Violation of decree—Contempt of court—Attachment—Evidence.*

On a bill in equity by owners of property in a residential neighborhood against a steel company, an injunction was issued because the defendant so operated its furnaces as to destroy the trees and shrubbery of the plaintiffs, to drive tenants from their houses and to blacken, disfigure and practically destroy and confiscate their whole property. On a petition for an attachment for contempt for violating the decree, the evidence showed that ore dust escaped from time to time from the defendant's furnace, and especially during the time while changes and experiments were being made to prevent the escape of such dust. It also appeared that the escape of such dust was not only annoying but injurious to plaintiffs' properties, in that it choked rain conductors upon houses, discolored fabrics and paints and injured carpets and curtains, and was of a greasy nature and difficult to remove from both garments and paints. The evidence also showed that defendants had made an honest effort at great expense to lessen the evil, and that they had so far succeeded that between the date of the decree and the time of the filing of the petition for contempt, the trees and shrubbery were not destroyed nor were tenants driven from houses, nor were the properties longer being practically destroyed and confiscated. *Held,* that the evidence was not sufficient to justify the issuing of an attachment against the defendant for contempt.

MESTREZAT, J., dissents.

Argued Feb. 17, 1908. Appeal, No. 140, Oct. T., 1907, by

defendants, from decree of C. P. No. 2, Allegheny Co., Oct. Term, 1902, No. 620, awarding an attachment for contempt of court in case of E. R. Sullivan and Jennie P. A. Sullivan, his wife, v. Jones & Laughlin Steel Company et al. Before MITCHELL, C. J., FELL, BROWN, MESTREZAT, POTTER, ELKIN and STEWART, JJ. Reversed.

Petition for attachment for contempt.

The trial court, YOUNG, J., found the defendants guilty of contempt in the following opinion :

This cause comes before us now upon the petition of the plaintiffs reciting that on April 19, 1904, at the above number and term of this court, a decree was entered by this court, among other things, perpetually enjoining and restraining the defendant "from such operation of its furnaces, situated in Fourteenth Ward of the City of Pittsburg, and described in the bill, as to cause to be emitted therefrom, clouds of ore dust, working and causing the injury to the property of the plaintiffs, as in the bill described and found by the Court;" and that, notwithstanding said decree, the defendants "have persistently and at intervals, daily and frequently, many times during the day and night, since the day when said decree was entered, so operated its furnaces as to cause to be emitted therefrom clouds of ore dust, working and causing the injury to plaintiffs' property, as in said bill described, and found by this Honorable Court, and in open and deliberate violation of the terms of said decree and injunction, and against the oft-repeated protests of your said petitioners," and that the petitioners are " advised, believe and charge that the defendant, its officers, agents and employees are each and all in contempt of this Honorable Court," and prays that Benjamin F. Jones, Jr., Willis L. King, William L. Jones, Henry S. Kiehl, W. W. Willock, William C. Moreland, James B. Laughlin and George M. Laughlin, who are the directors of the Jones & Laughlin Steel Company, of whom Benjamin F. Jones, Jr., is president, Willis L. King, vice-president, James B. Laughlin, treasurer, William C. Moreland, secretary, William L. Jones, general manager, and E L. Messler, superintendent of the Eliza Furnaces of said Jones & Laughlin Steel Company, be adjudged

to be in contempt of this court, and that attachment be issued against them for failure to comply with the aforesaid terms of said decree.

To this petition, presented to the court upon January 10, 1907, the defendants, on January 19, filed an answer, admitting that the defendants are the officers, agents and servants of the defendant company, and that they were duly notified of the entry of the decree at the time of its entry ; but denying " that the defendant, the Jones & Laughlin Steel Company, has persistently and at intervals, daily and frequently, many times during the day and night, since the day when said decree was entered, so operated its furnaces as to cause the injury to plaintiffs' property, as in said bill described, and found by this court, and in open and deliberate violation of the terms of said decree and injunction, and against the oft-repeated protests of the said petitioners." The answer also admits that " there have been at different times since April 19, 1904, escapes of ore dust from the Eliza furnaces, but not at all in character, extent or effect such escapes of ore dust as were enjoined by the decree of this honorable court, and most of these escapes occurred during the time that new and very extensive appliances—adopted to do away with the escape of ore dust—were being attached to said furnaces and were due to this cause, said new appliances being so extensive as not only greatly to disarrange and disturb the operation of the furnaces while the work of putting them up and attaching them was going on, but to render necessary the disconnecting and opening of certain pipes and parts of the furnaces, which contributed to the escape of ore dust." The answer also denies " that they have violated said injunction in letter or spirit, but beginning even before the entry of said injunction, and continuing to this time, they have been unceasing in their efforts to prevent the escape of ore dust from the furnaces in question," and avers that " they have been watchful and careful in the operation of their furnaces ; they have analyzed and selected all the ingredients used therein, ore, coke and limestone ; they have made important changes in their furnaces ; they have adopted and used new and costly appliances, and, without stopping to consider cost, they have in many other ways, done that which to them or to their engineers gave promise of good results in furtherance of

their efforts to remove entirely every cause of annoyance, or even inconvenience from escaping ore dust. And they are willing and ready in time to come, in the operation of said furnaces there, to do any and everything further in this behalf, which will prevent entirely, or still further reduce the escape of ore dust;" and that "speaking from their own observations, from what the changes in the furnaces and the new appliances themselves show; from the expressed opinions and beliefs of their engineers, superintendents and persons in charge of said furnaces; from what they have learned, and heard from many persons living in the Oakland district, and even nearer to the site of said furnaces, they are enabled to say, and do say, that great progress and advancement have been made towards preventing the escape of ore dust from the said furnaces, or at least reducing it to such an extent that no inconvenience or annoyance will be suffered therefrom;" and denying "that the defendants, its officers, agents, servants and employees are each, and all, or any of them, in contempt of this honorable court, and they pray, therefore, that the rule for an attachment entered in this case, may be discharged."

Upon this petition and answer being filed, this court, upon February 7, began taking the testimony to determine the question as to whether said defendants, its officers and agents, should be adjudged guilty of contempt of this court, and an attachment be issued against them for failure to comply with the terms of the decree; and the court continued to take testimony submitted, taking in all 1,962 pages of testimony, and finally having heard counsel both in oral argument and by written brief, we come now to determine the question whether the defendants in this case, its officers, agents and employees, are in contempt of this court and have violated its decree. The sole inquiry, then, before the court, is whether the Jones & Laughlin Steel Company, the defendant, or the persons named as its officers, employees and agents, have since April 19, 1904, refused or failed to comply with the decree of this court in enjoining and restraining them " from such operation of its furnaces, situated in the Fourteenth ward of the city of Pittsburg, and described in the bill, as to cause to be emitted therefrom, clouds of ore dust, working and causing the injury to the property of the plaintiffs, as in the bill described and

found by this court." There lies at the very foundation of this inquiry the question as to the meaning of this injunction, because, until we shall have determined exactly its meaning, we shall not be able to determine whether or not the defendants have disobeyed it. Ordinarily the meaning of a decree and the purpose to be accomplished by it are easily determined from the words of the order or decree, but where there may be any doubt concerning either the meaning of the decree or the purpose of the court in making it, we are entitled to have such light from proper sources as to make it clear beyond question, and especially is this true when the proceeding is one for the punishment of persons for its violation, the proceeding becoming a quasi criminal proceeding, and we are required to examine and strictly construe the order disobeyed as though it were a criminal statute. It is especially important in the case at bar to determine these things accurately and definitely because of the magnitude of the operations on the one hand and the great alleged injury on the other hand, arising out of conditions in a great manufacturing city, subject to many injuries and annoyances by reason of its being a manufacturing city that would not occur elsewhere, aside from the duty of the court to compel obedience to its decree. In seeking the meaning of the decree and the objects of the court in making it, the decree naturally falls into two propositions, or inquiries: first, what is meant by such operation of its furnaces as to cause to be emitted therefrom clouds of ore dust; and, second, what injury to plaintiffs' property is described in the bill and found by the court; and to the answer to these two propositions, or inquiries, we must first apply ourselves. To determine this, we must look to the findings of fact by the learned judge of the court below on the original trial of the case and to the opinion of the Supreme Court.

Such operation of the furnaces must include therein rebuilding, improving or enlarging, as found in the ninth finding of fact, in these words:

"That between March, 1898, and May, 1901, the three furnaces at that time constituting the Eliza furnaces were rebuilt, improved and enlarged upon the site then and now occupied by them, and a fourth furnace added upon that site. The first of the rebuilt furnaces was 'blown in' September 1,

1899 ; the second, May 13, 1900 ; the third, January 21, 1901, and the fourth on May 8, 1901. These furnaces as rebuilt, improved and enlarged, are constructed in accordance with modern and approved plans, and in their construction are in every respect equipped with modern appliances and improvements, and are equal, in many respects superior, to other furnaces in this locality in which pig iron is manufactured, and are among the largest known in the iron business, having a capacity each of about 500 tons daily production, and consuming together about 4,000 tons of ore daily."

And again in the fifteenth finding of fact :

" The ores known as the Mesaba ores are mined in the state of Minnesota, and in their physical structure are finer than the Old Range ores. Mesaba ores have been used in all furnaces in this district, in making pig iron since the year 1892, in increasing quantities, until the year 1902, when the relative quantities of Old Range and Mesaba ores brought to Lake Erie ports was about 50% of each; that the amount of Mesaba ores brought to lake ports had increased from 5,000 tons in 1892 to 12,000,000 tons in 1902. That the defendant company now uses in its furnaces, and has been using for the past seven or eight years, a portion of Mesaba ores known as Adams, Lincoln and Duluth, which are among the best in quality of all Mesaba ores. The amount of Mesaba ores used by the defendant company in its furnaces in the past seven or eight years has averaged 30% of the total ore used, which is a less proportion than is used generally in blast furnaces in this district. That at the present time the percentage of Mesaba ore used at the Eliza furnace is about 23%."

And again in the sixteenth finding of fact :

" That the escape of ore dust due to ' slips ' in the furnace is a financial loss to the operator, both in the matter of production and in the loss of ore ; that the defendant has been diligent in its efforts to find means, or to adopt appliances or inventions which will prevent the escape of dust from its furnaces; that up to the present time no appliance has been found which will effectually prevent, or reasonably diminish, the escape of the ore dust from blast furnaces, when ' slips ' occur. That the use of Old Range ores exclusively would not materially lessen the number of ' slips ' occurring in furnaces,

but would, to a considerable extent, decrease the amount of ore dust discharged into the air at each explosion."

As found by the court below, the operation complained of was the building and enlarging of the furnaces, the use therein of large quantities of Mesaba ore and the emission into the atmosphere of unconsumed portions of that ore in great quantities, carried by currents of air in heavy clouds. An examination of the opinion of Mr. Justice Brown in the case when it was in the appellate court, in 208 Pa., at p. 549, shows that the court had these findings of fact in mind. There the learned justice says:

" Their complaint is that the appellee, in tearing down the three furnaces and replacing them with the four new ones, of immense size and several times the capacity of the old, and in using in them the fine ' Mesaba ' ore dust, without so operating them as to prevent the escape of the dust from 'slips,' causing admitted devastation, is practically confiscating their properties. . . . Here the furnaces were artifically brought by appellee on to its lands by being built there by it, and the ' Mesaba ' ore converted by the furnaces into iron is also artificially brought there by it. It knew, when about to erect these new furnaces, of immense size and great capacity, that, in their operation, the rights of others, among them those of the appellants, to the use and enjoyment of their property, situated in what, for years, had been a portion of the city given up to residences, were not to be utterly disregarded; and when it began to use the fine ore dust, which has manifestly caused the serious injury to the property of the appellants, it was again bound to consider the effect of the use of this ore upon the nearby residences."

We must, therefore, conclude that the words, " such operation of its furnaces as to cause to be emitted therefrom clouds of ore dust," mean the building, the enlargement and the use of its furnaces and the use of Mesaba ore in the furnaces in such a way as to cause clouds of ore dust to be cast from them into the atmosphere. As said by the Supreme Court, it is not the enlargement of their furnaces and the use of Mesaba ore in the furnaces, but it is the enlargement of the furnaces and the use of Mesaba ore in the furnaces they being so operated as to cause slips and explosions and the emission into the

air of clouds of ore dust, that makes the injury of a new kind and not one of degree, when compared with the operations of other furnaces within this manufacturing district. The complainant, then, having alleged this new kind of injury, the court below having found the nature of the act and the Supreme court having distinguished it as differing in kind, we have no difficulty in understanding that the final decree of the court, which was made in the identical language used by the learned justice at the close of his opinion, meant that what was perpetually enjoined was that operation of the furnaces, that use of Mesaba ore in the furnaces so that the slips and explosions occur and so that clouds of dust are emitted from them.

We next turn to the second inquiry, what is meant in the decree by clouds of ore dust working and causing the injury to the property of the plaintiffs as in the bill described and found by the court below. This is defined by the learned judge of the court below in the seventeenth finding of fact:

"That ore dust was first noticed settling upon properties in the neighborhood of defendant's furnaces as early as 1899, but that deposit did not become serious until about July, 1901. Since that time, dust, in greater or less quantities, has been carried from defendant's furnaces and deposited upon and about plaintiffs' premises. That the effect of the dust is not only annoying, but injurious to property; that it chokes rain conductors upon the houses, discolors fabrics and paints and injures carpets and curtains; that it is of a greasy nature and difficult to remove from both garments and paints; that it has also been destructive to fruit and shade trees and vegetation generally, and has depreciated the value of plaintiffs' properties from twenty-five per cent to fifty per cent."

Turning now to the opinion of Mr. Justice Brown, as found on page 550, we find this expression:

"When, however, as the result of the improvements voluntarily made by the appellee, and its use of a new ore, the annoyance, inconvenience and injury to which appellants are now subjected do not differ merely in degree from those to which they formerly submitted as part of their lot as citizens of the 'Iron City,' but in kind, and practical destruction and confiscation of their properties confront them, a very different

situation is presented to a chancellor from those cases in which the rule is laid down that people who live in such a city, or within its sphere of usefulness, do so of choice, and, therefore, voluntarily submit themselves to its peculiarities and its discomforts. That very rule, as announced in Huckenstine's Appeal, supra, recognizes their right to live and have their homes there; and a case cannot be found as authority for the right of any manufacturing company, located in a manufacturing district of a city to so rebuild and operate its furnaces as to actually destroy homes and other property in a residential portion of the same city. That this is what the appellee is doing, is an irresistible conclusion, and the only relief is by injunction. If it is to be permitted to so operate its furnaces that the burning and corroding dust emitted from its stacks is borne by the winds and scattered over the properties of the appellant with destroying effect, simply because of the plea that it cannot be helped, for the same reason it might ask a chancellor to stay his arm from arresting the descent of showers of fire from the same stacks down on the same nearby homes. If the appellee possessed the right of eminent domain, it might take the properties of the appellants and do with them what it pleases, but, not having such high right, it cannot do so, even indirectly. It has a right to the use and enjoyment of its own property, but so have the appellants to theirs, for whom the law says to the former, 'sic utere tuo ut alienum non lædas.'"

We must conclude, therefore, that the injury which it was intended to prevent by this decree under the words, "working and causing the injury to the property of the plaintiffs, as in the bill described and found by this court," means the injury resulting from the casting of ore dust upon the complainants' property, and that, "the effect of the dust is not only annoying, but injurious to property; that it chokes rain conductors upon the houses, discolors fabrics and paints and injures carpets and curtains; that it is of a greasy nature and difficult to remove from both garments and paints; that it has also been destructive to fruit and shade trees and vegetation generally, and has depreciated the value of plaintiffs' properties from twenty-five per cent to fifty per cent."

We turn, then, to the evidence in this case to determine, in the first place, if the defendant since the granting of the

injunction on April 19, 1904, has been operating its furnaces, using the finely pulverized Mesaba ore and thereby allowing slips and explosions to occur, throwing out clouds from which the ore dust settles upon the property of complainants, causing not only an annoying but an injurious effect to the property in the manner found by the court below. From the admissions of the answer and the evidence, we must conclude that ore dust does from time to time escape from the Eliza furnaces. We must also conclude that large quantities of ore dust escaped while changes and experiments were being made in an honest effort to prevent the escape of ore dust in the operation of the furnaces, but the evidence shows that frequently when changes and experiments were not being made, but when the furnaces were being operated in the ordinary and usual way, there have been escapes of clouds of ore dust from the furnaces. All of plaintiffs' and many of defendants' witnesses testified that clouds of ore dust came from the furnaces. The evidence conclusively shows that defendants have persistently and frequently, both day and night, so operated their four old furnaces and a fifth furnace built since the granting of the injunction as to be emitted therefrom clouds of ore dust. The evidence shows conclusively that ore dust from the furnaces has been deposited upon and about plaintiffs' premises frequently since the making of the decree. The evidence also shows conclusively that the effect of the ore dust is not only annoying but injurious to property; that it chokes rain conductors upon the houses, discolors fabrics and paints and injures carpets and curtains; that it is of a greasy nature and difficult to remove from both garments and paints. The evidence does not satisfy us that it has been destructive of fruit and shade trees and vegetation generally since April 19, 1904. Neither does the evidence satisfy us that there has been any further depreciation of the value of petitioners' property since the granting of the injunction, but it is nevertheless true that there has been no substantial improvement in values since that time, although real estate values elsewhere in the city not subjected to similar injury have greatly increased. But the evidence shows just as conclusively that the frequency of the clouds of ore dust and the quantity escaping from defendants' furnaces and depositing upon plaintiffs' property, is not in such

quantities as prior to the making of the decree. A careful consideration of the evidence produced by both plaintiffs and defendants irresistibly leads to the conclusion that the clouds are not so frequent and the quantities of ore dust escaping not so great. The defendants' witnesses, especially those of the defendants in charge of the furnaces, including the general manager, the general superintendent and the president of the company, estimate that the escape of ore dust has been lessened eighty per cent. This does not indicate what quantity escapes and is only evidence that the quantity escaping is much less than formerly. This is the sole defense of the defendants. They say in answer to the petition asking for an attachment that the escapes of ore dust were not of such character, extent or effect as were enjoined by the decree. They deny that they violated the injunction in letter or spirit, but say that beginning before the entry of the injunction and continuing to the present they have been unceasing in their efforts to prevent the escape of ore dust from the furnaces ; that they have been watchful and careful in the operation of their furnaces ; have analyzed and selected all the ingredients used therein, ore, coke and limestone ; that they have made important changes in their furnaces ; they have adopted and used new and costly appliances, without considering cost, in their efforts to remove entirely every cause of annoyance or even inconvenience from escaping ore dust; and that they are now willing and ready at all times to come, in the operation of said furnaces, to do any and everything which will prevent entirely or still further reduce the escape of ore dust; and they say they have made great progress and advancement towards preventing the escape of ore dust, or at least have decreased it so that no inconvenience or annoyance will be suffered in the future.

The evidence in this case shows most conclusively that neither trouble nor expense has been spared by the defendants to prevent the escape of ore dust from their furnaces, and the consequent injury to plaintiffs' property. Every known method of operation, every experiment, however costly, has been carefully investigated and thoroughly tried to prevent the escape of ore dust. The defendants have expended for this purpose alone $285,000. The defendants, in addition to ex-

pending these large sums of money, have suffered great loss, estimated at over $200,000, in their output by shutting down their furnaces to make experiments, in reducing the capacity of their furnaces, and in the selection of coal, limestone and other material. We are satisfied that the defendants have made every effort to comply with the decree, and there can be nowhere found in the evidence anything which could be regarded as evidence of the obstinate refusal to obey the decree of the court, except in so far as their operation of the furnaces at all has been a violation of the decree. These defendants, we are satisfied, have done everything human ingenuity could suggest, or human experience indicate, to prevent their furnaces from emitting ore dust. It is insisted by counsel for defendants that these efforts upon the part of defendants are conclusive evidence that the defendants have not violated the spirit of the decree, and, therefore, that they should not be attached for contempt. We cannot agree with the position of the defendants that this is a good answer to the charge that defendants have violated the decree. The decree in plain words forbade the emission of clouds of ore dust, working the injury found by the court as injurious to property in the way described by the court, and the defendants have since the granting of that decree so operated their furnaces as to frequently cause to be emitted clouds of ore dust causing the same kind of injury, although the emission of clouds is not so frequent, the amount of ore dust cast upon plaintiffs' property, and the consequent injury, not so great as when the decree was granted. We cannot understand that this decree was intended to enjoin the defendants from causing their furnaces to emit a certain number of clouds, or that such clouds should contain less than a certain quantity of ore dust, or that they must not deposit more than a certain quantity of ore dust upon plaintiffs' property, or that the injury must not exceed a certain percentage of the value of the property. We understand that decree to mean in the light of the findings of fact, as interpreted by the Supreme Court, that the injury differed in kind from the ordinary injury suffered by residents of a manufacturing city, in that the defendants had enlarged their furnaces, brought there fine Mesaba ore, and so operated their furnaces as to permit this ore to be cast upon plaintiffs' prop-

erty, thereby causing the injury found by the court. As the defendants are still causing their furnaces to be operated so as to cause to be emitted from them clouds of ore dust, which is cast upon plaintiffs' property, causing substantially the same kind of injury, though not as great in extent, they have been guilty of refusing to obey the decree of the court, and are to be adjudged guilty of contempt in doing so. Whatever views we might hold upon an original hearing of the case as now presented, however we may be inclined by the facts as presented by the defendants to the belief that they have done the best they could, and, however we may be affected by the belief that the defendants did not intend to disobey the decree, we are sure that it is our duty to enforce the decree.

We have no discretion in deciding this question. The appellate court has determined the question, it has defined the duty of defendants, and by its decree declared that these defendants should not do the things which they had theretofore done, and which the evidence shows conclusively they are still doing. If they cannot obey the decree and operate their works, they must cease to operate them until they can obtain a modification of the decree.

The defendants must be adjudged to be in contempt of this court, and an attachment must issue against them for failure to comply with the terms of its decree.

*Error assigned* was decree awarding an attachment for contempt.

*David T. Watson* and *George C. Wilson*, with them *Clarence Burleigh, Wm. D. Evans* and *John M. Freeman*, for appellants.—The decree was to be strictly construed in favor of the defendants : Wisconsin Central R. Co. v. Smith, 52 Wis. 140 (8 N. W. Repr. 613) ; Louisville, etc., R. R. Co. v. Miller, 112 Ky. 464 (66 S. W. Repr. 5) ; Appeal of Philadelphia & Reading Railroad Co., 2 Walker's Reports, 243 ; High on Injunction (4th ed.), sec. 1433 ; Coit v. Freed, 15 Utah, 426 (49 Pac. Repr. 533) ; Dawson v. Paver, 5 Hare, 415 ; Woodruff v. North Bloomfield Gravel Min. Co., 45 Fed. Repr. 129 ; Magennis v. Parkhurst, 4 N. J. Eq. 433 ; Probasco v. Probasco, 30 N. J. Eq. 61 ; Worcester v. Truman, 1 McLean, 483.

Where the proof leaves it a matter of doubt as to whether the injunction has been violated, the position for attachment for contempt will be denied: Celluloid Mfg. Co. v. Chrolithian Collar & Cuff Co., 24 Fed. Repr. 585 ; Louisville, etc., R. R. Co. v. Miller, 112 Ky. 464 (66 S. W. Repr. 5); Woodruff v. Mining Co., 45 Fed. Repr. 129 ; Public Service Corporation of N. J. v. DeGrote, 62 Atl. Repr. 65 ; Postal Tel. Cable Co. v. R. R. Co., 88 Va. 929 (14 S. E. Repr. 691); Accumulator Co. v. Consolidated Electric Storage Co., 63 Fed. Repr. 793 ; Dawson v. Paver, 5 Hare, 415.

*Thomas Patterson,* of *Patterson, Sterrett & Acheson,* for appellees.—The only attitude of a defendant towards an injunction is one of obedience: Rodgers v. Pitt, 89 Fed. Repr. 424 ; Woodruff v. Mining Co., 27 Fed. Repr. 795 ; Russell v. Ry. Co., 3 MacN. & G. 104 ; People ex rel. Day v. Bergen, 53 N. Y. 404 ; Penna. R. R. Co. v. Thompson, 49 N. J. Eq. 318 ; Patterson v. Building Trades Council of Wilkes-Barre, 31 Pa. C. C. Rep. 401.

OPINION BY MR. JUSTICE BROWN, June 23, 1908 :

The decree in this case perpetually enjoins Jones & Laughlin Steel Company from such operation of its furnaces, situated in the Fourteenth ward of the city of Pittsburg, as to cause to be emitted therefrom clouds of ore dust, working and causing the injury to the property of the appellees as in their bill of complaint described and found by the court below: Sullivan v. Jones & Laughlin Steel Co., 208 Pa. 540. For an alleged violation of this injunction the appellants were found guilty of contempt, and their appeal is from that finding and the penalties imposed upon them.

The relief given the appellees was what they specifically asked for in the first prayer of their bill. It was that the steel company " be enjoined and restrained from such operation of its furnaces, situated in the Fourteenth ward of the city of Pittsburg, as above described, as to cause to be emitted therefrom clouds of ore dust, working and causing an injury to your orators' property, as in said bill described." The injuries arrested were those " in the bill described and found by the court below ; " and if they were continued by the appellants,

in violation of the decree forbidding them, the order of the court in the proceedings for contempt will not be disturbed. After deliberate and mature consideration, our decree went forth for relief to the appellees, and, as made, it will be enforced. It is not, however, to be stretched to reach what was not forbidden and what would not have been enjoined.

When those enjoined by a decree in equity are charged with having violated it, its violation must be made to clearly and satisfactorily appear by the petitioner asking for its enforcement: Appeal of Philadelphia & Reading Railroad Company, 2 Walker's Reports, 243. Until its violation so appears there can be no finding of contempt, and a fine will not be imposed nor an order of commitment made. "No punishment should be inflicted unless the facts constituting the contempt have been clearly and satisfactorily established:" Woodruff v. North Bloomfield Gravel Mining Co. et al., 45 Fed. Repr. 129. In a proceeding such as this now before us the injunction must, like a penal or criminal statute, be construed strictly in favor of the person charged with having violated it: Wisconsin Central Railroad Co. et al. v. Smith, 52 Wis. 140; and a chancellor will not punish unless the guilt of the enjoined be clearly established: Probasco v. Probasco, 30 N. J. Eq. 61. "The procedure by rule for contempt should not be exercised unless a case is presented of actual disobedience. . . . The entry of an order of injunction is, in some respects, analogous to the publication of a penal statute. It is a notice to the party that certain things must be done or not done, under a penalty to be fixed by the court. The language of such notice should not be stretched to cover acts not fairly and reasonably within its meaning:" Louisville & N. R. R. Co. v. Miller, 112 Ky. 464. "An order of commitment for breach of an injunction being strictissimi juris, it will not be granted except upon a clear and satisfactory showing of the actual violation:" High on Injunctions (3d ed.), sec. 1449.

The first inquiry in passing upon appellants' alleged violation of the decree is as to what was enjoined. The injunction was to stop the injuries "in the bill described and found by the court below." What we regarded as those injuries can readily be ascertained from the following findings of the court

below, recited in our opinion : " Ore dust was first noticed set-
tling upon properties in the neighborhood of defendants' fur-
naces as early as 1899, but the deposit did not become serious
until about July, 1901.   Since that time, dust, in greater or
less quantities, has been carried from the defendants' furnaces
and deposited upon and about plaintiffs' premises.   The effect
of the dust is not only annoying, but injurious to property ; it
chokes rain conductors upon houses, discolors fabrics and
paints, and injures carpets and curtains ; it is of a greasy
nature and difficult to remove from both garments and paints ;
it has also been destructive to fruit and shade trees and vege-
tation generally, and has depreciated the value of plaintiffs'
properties from twenty-five per cent, to fifty per cent. . . .
The residence district in which plaintiffs' property is situated,
and which is a part of the Fourteenth ward of the city of
Pittsburg, was, prior to the year 1899, a pleasant and habit-
able part of the city.   While subject, as most parts of the city
are, to smoke, it occasioned no special inconvenience to the in-
habitants and the testimony shows that flowers, trees and
shrubs were kept and cared for, and were not injured, by any
smoke or dust which might prevail throughout the district.
Some of the witnesses for the plaintiffs testify that they first
noticed the ore dust as early as 1899, but it did not become
serious until the year 1901.   In the latter year, when all four
furnaces were completed and in operation, the ore dust was
thrown out in large quantities and at more frequent intervals
and has increased from that time down until the filing of the
bill.   The plaintiffs' property by reason of its location near
the defendant's furnaces, receives the full effect of the dis-
charge of ore dust therefrom.   Almost all the trees in the or-
chard which formerly produced some eighty bushels of pears
in a season, the shade trees, of which there were something
over twenty in number, and the shrubbery about the house have
been for the most part destroyed.   The whole property has
been blackened and disfigured.   A number of tenants have
been forced to leave the dwelling houses by reason of the pen-
etrating and damaging deposits of ore dust.   From the con-
ductors leading from the porch roofs in front of these houses
the plaintiffs had removed on one occasion three barrels full of
ore dust the weight of the amount thus removed being some

1,200 pounds. . . . The effect of the ore dust upon properties upon which it is deposited is very damaging. It corrodes tin and metal work which are exposed to it, it chokes and fills conductors, it discolors and removes paint, it affects injuriously fabrics in the interior of houses both by impregnating them with dust and by attacking and injuriously affecting the fiber. People are compelled to keep their doors and windows closed during the passing of a dust shower, and even with these precautions, the ore dust shifts in through the crevices to such an extent that it is easily traceable upon window sills, floors, books, furniture and carpets. The ore dust frequently descends in such large quantities that persons caught in it are compelled, in some instances, to hoist umbrellas and seek refuge on porches and in houses. Their clothing is sometimes stained and otherwise injured. It is of a greasy nature, and any garment or surface affected by it is difficult to cleanse." From this intolerable condition relief was granted, because it amounted, in the judgment of this court, to " practical destruction and confiscation " of appellants' properties, and but for this effect the decree dismissing the bill would have been affirmed, for we said : " The appellants are not complaining because appellee is operating its furnaces. They would not be heard if that were their only complaint. The city of Pittsburg is a busy manufacturing center, and by day and by night clouds of smoke ascend from the stacks of its numberless mills, factories and furnaces, oftentimes hanging over it like a pall. In a manufacturing district of this city the appellee has established its furnaces, and is engaged in an important and lawful business. The appellants, in a residential portion of the same city, close by this manufacturing district, own houses in which their tenants live. So situated, they must expect a measure of annoyance and discomfort, arising from the dust and smoke, which cannot be avoided in their manufacturing metropolis, and are borne to the homes of the city and fill the air that is breathed. To this general annoyance and discomfort appellants submitted for years without complaint, and they were bound to do so, for they chose to erect their houses not only in sight of great manufacturing plants, but within certain reach of the smoke and dust, without which the fires of the furnaces and factories could not burn. Of all this there is

now no complaint by them. What, in common with all other citizens, they had endured for years, up to the summer of 1901, they were willing to continue to endure ; and they are not now complaining of appellee's manufacture of iron, even with ' Mesaba ' ore. Their complaint is that the appellee, in tearing down the three furnaces and replacing them with the four new ones, of immense size and several times the capacity of the old, and in using in them the fine ' Mesaba ' ore dust, without so operating them as to prevent the escape of the dust from ' slips,' causing admitted devastation, is practically confiscating their properties. To preserve these to them, and to protect them in their absolute right to the enjoyment of their private property, subject to the general conditions of the city in which they live, this bill was filed, and its prayer is not to restrain the appellee from operating its furnaces and manufacturing iron, but is to enjoin it from such operation of them as causes the serious and exceptional injuries alleged in the bill and proved by the testimony. . . . If this bill were for relief from personal inconvenience and interference with the appellants' full and free enjoyment of their property, due merely to the conditions of smoke and dust that have existed for years, and will exist as long as the city itself continues to be the great steel and iron manufacturing center, it would be promptly dismissed. Of the smoke and dust now coming from all the other surrounding mills and furnaces no complaint is made, and of what used to come from the old furnaces of the appellee the appellants made no complaint, and would not be complaining now but for the changed conditions brought about by the appellee. The court below, though requested by it, refused to find that ' the matters complained of by plaintiffs are only such discomforts and inconveniences as are, and always have been, incident to and consequent upon close proximity to an exclusively manufacturing section of a manufacturing city.' . . . . We are not to be understood as saying, or even intimating, that the large furnaces could not be erected and operated, that ' Mesaba ' ore cannot be used, or that if, in the operation of the furnaces and the use of this fine ore, the discomfort and annoyance of the appellants had simply been increased in degree, they would be entitled to equitable relief." Nothing could be clearer than that the decree was not intended

to enjoin the operation of the furnaces nor the use of " Mesaba " ore.

The averment of the appellees in their petition for an attachment is that, notwithstanding the entering of the decree, the " Jones & Laughlin Steel Company has persistently, and at intervals daily, and frequently, many times during the day and at night, ever since the day when said decree was entered, so operated its furnaces as to cause to be emitted therefrom clouds of ore dust, working and causing the injury to plaintiffs' property as in said bill described and found by this honorable court, and in open and deliberate violation of the terms of said decree and injunction." To this appellants answered : " It is denied that the defendant, the Jones & Laughlin Steel Company, has persistently and at intervals, daily and frequently, many times during the day and night, since the day when said decree was entered, so operated its furnaces as to cause to be emitted therefrom clouds of ore dust, working and causing the injury to plaintiffs' property, as in said bill described, and found by this court, and in open and deliberate violation of the terms of said decree and injunction, and against the oft-repeated protests of the said petitioners. They admit there have been at different times since April 19, 1904, escapes of ore dust from the Eliza furnaces, but not at all in character, extent or effect such escapes of ore dust as were enjoined by the decree of this honorable court, and most of these escapes occurred during the time that new and very extensive appliances— adopted to do away with the escape of ore dust—were being attached to said furnaces, and were due to this cause, said new appliances being so extensive as not only greatly to disarrange and disturb the operation of the furnaces while the work of putting them up and attaching them was going on, but to render necessary the disconnecting and opening of certain pipes and parts of the furnaces, which contributed to the escape of ore dust. They deny that they have violated said injunction in letter or spirit, but beginning even before the entry of said injunction, and continuing to this time, they have been unceasing in their efforts to prevent the escape of ore dust from the furnaces in question. They have been watchful and careful in the operation of their furnaces, they have analyzed and selected all the ingredients used therein, ore, coke and lime-

stone; they have made important changes in their furnaces; they have adopted and used new and costly appliances and without stopping to consider cost, they have in many other ways, done that which to them, or to their engineers, gave promise of good results in furtherance of their efforts to remove entirely every cause of annoyance, or even inconvenience from escaping ore dust." On this issue it was for the court below to find whether the injunction had been violated, and, if it had, to impose proper penalties for its violation. The decree as made must be obeyed, and it will be enforced without regard to consequences to the steel company in the operation of its furnaces. If it cannot operate them without practically destroying the properties of appellants, it must close them. The excuse, that every possible effort has been made to avoid this destruction, will not be heard. This was taken into consideration when the decree against the company was made forbidding it to continue the operation of its furnaces in such a manner as to cause the injuries found to have been sustained by the appellees; but, that the scope of the decree may not be misunderstood, it is again to be noted that the injunction was not to relieve the appellees merely from discomforts and annoyances resulting from smoke and dust emitted from the furnaces and factories surrounding their properties, for such relief could not have been granted: Huckenstine's Appeal, 70 Pa. 102.

What were the findings of the court upon which the appellants were adjudged guilty of contempt? We give them in the court's own words: "From the admissions of the answer and the evidence, we must conclude that ore dust does from time to time escape from the Eliza furnaces." This was not enjoined. "We must also conclude that large quantities of ore dust escaped while changes and experiments were being made in an honest effort to prevent the escape of ore dust in the operation of the furnaces." This was not forbidden. On the contrary, the decree contemplated honest efforts on the part of the steel company to prevent the destructive escape of the Mesaba ore dust in the operation of the furnaces, and the injunction was not to prevent its escape in large or small quantities while changes and experiments were being made to prevent its escape at all, but only such escape in the ordinary

and usual operation of the furnaces as worked the injuries described in the bill and found by the court. "The evidence shows that frequently when changes and experiments were not being made, but when the furnaces were being operated in the ordinary and usual way, there have been escapes of clouds of ore dust from the furnaces. All of plaintiffs' and many of defendants' witnesses testified that clouds of ore dust came from the furnaces. The evidence conclusively shows that defendants have persistently and frequently, both day and night, so operated their four old furnaces and a fifth furnace built since the granting of the injunction as to cause to be emitted therefrom clouds of ore dust. The evidence shows conclusively that ore dust from the furnaces has been deposited upon and about plaintiffs' premises frequently since the making of the decree." The mere emission of ore dust and the escape of clouds of it are not forbidden, even if deposited upon the plaintiffs' premises, unless the deposits result in the injuries, "in the bill described and found by the court." "The evidence also shows conclusively that the effect of the ore dust is not only annoying, but injurious to property, that it chokes rain conductors upon the houses, discolors fabrics and paints and injures carpets and curtains; that it is of a greasy nature and difficult to remove from both garments and paints." This is the sum total of the injuries found by the court to have been inflicted upon the appellee since the decree was made, and the foregoing are all the findings upon which the appellants were adjudged guilty of contempt. If, on the appeal from the decree dismissing complainants' bill, nothing more had appeared than that the ore dust from the steel company's furnaces, of a greasy nature and difficult to remove from both garments and paints, had been deposited upon the premises of the appellees, causing annoyance and injuries by choking up rain conductors upon the houses and discoloring fabrics and paints and injuring carpets and curtains the decree would unquestionably have been affirmed, and nothing in our opinion can be found to indicate anything else. What the court found in this proceeding was nothing more than "annoyance, inconvenience and injury" to which the appellees must submit "as part of their lot as citizens of the 'Iron City,'" from which relief cannot be given them in equity by closing the plant of the

steel company. The injunction issued against it and that now hangs over it went out because it so operated its furnaces as to destroy the trees and shrubbery of the appellees, to drive tenants from their houses, and to blacken, disfigure and practically destroy and confiscate their whole property. The court failed to find, and could not have found under the evidence, that any such condition has continued since the injunction was issued. On the contrary, the affirmative finding is, " the evidence does not satisfy us that it (dust) has been destructive of fruit and shade trees and vegetation generally since April 19, 1904. Neither does the evidence satisfy us that there has been any further depreciation of the value of petitioners' property since the granting of the injunction, but it is nevertheless true that there has been no substantial improvement in values since that time, although real estate values elsewhere in the city not subject to similar injury have greatly increased. But the evidence shows just as conclusively that the frequency of the clouds of ore dust and the quantity escaping from the defendants' furnaces and depositing upon plaintiffs' property, is not in such quantities as prior to the making of the decree. A careful consideration of the evidence produced by both plaintiffs and defendants irresistibly leads to the conclusion that the clouds are not so frequent and the quantities of ore dust escaping not so great. The defendants' witnesses, especially those of the defendants in charge of the furnaces, including the general manager, the general superintendent and the president of the company, estimate that the escape of ore dust has been lessened eighty per cent. This does not indicate what quantity escapes and is only evidence that the quantity escaping is much less than formerly." To what this changed condition is due appears from the following taken from the opinion of the court: " The evidence in this case shows most conclusively that neither trouble nor expense has been spared by the defendants to prevent the escape of ore dust from their furnaces, and the consequent injury to plaintiffs' property. Every known method of operation, every experiment, however costly, has been carefully investigated and thoroughly tried to prevent the escape of ore dust. The defendants have expended for this purpose alone $285,000. The defendants, in addition to expending these

large sums of money, have suffered great loss, estimated at over $200,000 in their output by shutting down their furnaces to make experiments, in reducing the capacity of their furnaces, and in the selection of coal, limestone and other material. We are satisfied that the defendants have made every effort to comply with the decree, and there can be nowhere found in the evidence anything which could be regarded as evidence of the obstinate refusal to obey the decree of the court except in so far as their operation of the furnaces at all has been a violation of the decree. These defendants, we are satisfied, have done everything human ingenuity could suggest, or human experience indicate to prevent their furnaces from emitting ore dust."

True, the court found that the steel company is still so operating its furnaces " as to cause to be emitted from them clouds of ore dust, which is cast upon plaintiffs' property, causing substantially the same kind of injury, though not as great in extent," as before the injunction was issued. The finding is not that the same injury is being inflicted. It states just what the injury now is, viz.: the choking of rain conductors upon the houses, the discoloring of fabrics and paints and the soiling of carpets and curtains. But these are not the serious and exceptional injuries " in the bill described and found by the court below," to arrest which the injunction was awarded. Trees and shrubbery are no longer being destroyed, tenants are no longer being driven from the houses of the appellees; their properties are no longer being blackened, disfigured and practically destroyed and confiscated, and the depreciation in their value no longer goes on. The scope of the injunction was manifestly misunderstood by the learned trial judge. Another judge of the same court understood and properly construed it in McWilliams v. Jones & Laughlin Steel Company, as appears in his opinion filed December 4, 1905. What it was intended to arrest has been arrested, and the unbearable condition to which the appellees had been subjected has been relieved, for the court so finds. If it had found that the steel company, in the operation of its furnaces, was still inflicting serious and exceptional injuries upon the appellees and the work of destruction and confiscation was still going on, the penalties imposed upon the appellants would not be too

severe. This appeal must be sustained, for, on the case as presented at the hearing of the application for the attachment, the injunction would not have gone out. The finding, adjudging the appellants guilty of contempt, is set aside, and the order imposing the fines upon them is reversed, with costs.

Mr. Justice Mestrezat, dissenting:

I regard this case as a reargument on the merits of the former case, and I submit that the majority opinion shows that this court has reconsidered this case and entered a decree reversing its former decree and denying the plaintiffs the relief which in our adjudication four years ago, after argument and reargument, we held they were entitled to. It is true that three members of the court dissented from the decree then entered, and held that the plaintiffs were not entitled to any relief. The majority of the court, however, reversing the trial court, ordered an injunction to be issued "perpetually enjoining Jones & Laughlin Steel Company from such operation of its furnaces . . . . as to cause to be emitted therefrom clouds of ore dust, working and causing the injury to the property of the appellants as in the bill described and found by the court below." The learned trial judge in entering the decree from which this appeal was taken, after finding the facts and correctly interpreting our decree in an exhaustive and unanswerable opinion, states in conclusion the gist of the case as follows: "As the defendants are still causing their furnaces to be operated, so as to cause to be emitted from them clouds of ore dust, which is cast upon the plaintiffs' property, causing substantially the same kind of injury, though not as great in extent, they have been guilty of refusing to obey the decree of the court and are to be adjudged guilty of contempt in doing so." The opinion of the learned judge amply vindicates the decree which he entered, adjudging the defendants guilty of contempt, and, upon that opinion, I would affirm the decree of the court below.